## HOWE MACHINE CO. *v.* PEASE.

### *Liability of Innkeeper.*

Loss of goods or chattels put in charge of an innkeeper by a guest, gives rise to a presumption of the innkeeper's negligence; but that presumption may be repelled, not only by proof that the loss occurred through inevitable casualty or superior force, but by proof that he was not negligent, or proof that the goods or chattels were of a certain perishable or changeable kind, which would give rise to a presumption that their loss occurred in due course and order of things.

In case against an innkeeper for alleged negligence in keeping plaintiff's horse, whereby he fell ill and became worthless, the referee reported that on January 15, the horse was left with defendant by plaintiff's servant, who had been driving him more than a month in travelling from place to place, and who put up on that day at defendant's inn as a guest, defendant taking said horse as an innkeeper; that on February 5, the servant took the horse and started on his way, but soon observed that he was weak or lame in his back, and on February 11, as he continued ill and weak, he left him at another inn, disabled, and with sores breaking out upon his legs; that "the horse was well taken care of at the defendant's stable, in feed and exercise, and in the same manner that he took care of his own horses," and that " defendant's hostler, who had charge of and fed and attended this horse was well qualified for the place, being accustomed to the business, and careful and attentive;" that in the previous November the horse had been sick with the epizooty, which had left him in an unhealthy state, and that the sores upon his legs were the result of that disease; and that the weakness of the back resulted from a sprain, the cause of which the referee was unable to discover. *Held*, that it was manifest upon the whole report that the weakness in the horse's back was not occasioned by defendant's negligence, and that plaintiff could not recover.

CASE against defendant as an innkeeper for negligence in keeping plaintiff's horse. The case was referred, and the referee made the following report.

On the 8th or 10th of December, 1872, one of plaintiff's traveling agents, Newell S. Sweat, left Concord, N. H., on plaintiff's business, with a team belonging to plaintiff, consisting of a gray horse, a brown mare, and a light sleigh.  Sweat drove with this team to a number of places in N. H. and Vt. between the day he left Concord and the 15th of the following January.  On the 15th of January he drove from Woodstock, where he had been stopping for three or four days, to Hartford, and put up with this team as a guest, at the inn kept by the defendant at Hartford.  Later in the same day, or early on the day following, Sweat left defendant's inn and went to Concord, leaving the horses in defendant's care.  He returned on or about the 19th, stopped a short time, and again left for an indefinite length of time, and again leaving the horses in defendant's care, where they remained till the 5th of February following.  On the 5th of February, Sweat returned to defendant's inn, took the team and drove to West Fairlee, where he stopped over night, then to Bradford, where he left the team for two or three days, then to Chelsea, where he arrived the 11th of February.  Here the team remained until the 1st of April, when it was taken to Claremont, N. H.  In November previous to the time they left Concord, the gray horse was afflicted with the epizooty.  He was quite sick for a few days, and then began to recover, and in the course of a few weeks appeared to be well.  Both horses were apparently in health when they left Concord.  When Sweat left the horses in defendant's care, he directed that they be exercised some.  This was done. A day or two after they were left with defendant, they were driven to West Hartford; the next day, to Mr. Merchant's, and three or four days later, to Hanover.  At Hanover the gray horse fell while being driven at a walk.  After the drive to Hanover, they were not further exercised by being driven, but were exercised in the hotel yard in the same manner as defendant's horses.  When Sweat took the horses from the defendant on the 5th of February, the gray horse had a cut on one of his fore legs. This cut was discovered the morning after the drive to Hanover, and was cared for by defendant's hostler.  Soon after leaving defendant's inn on the 5th of February, Sweat discovered that the gray horse appeared to be lame and weak across the back.  This lameness continued, and at Bradford, Sweat directed the hostler at the inn where he left the horses, to call a doctor.  Dr. Williams was called.  He examined the horse and prescribed for him. When the horse reached Chelsea on the 11th, he was still lame and weak and unfit for use, and was never afterwards used by the plaintiff.  While here, several sores appeared on the inner side of

the hind legs. He was kept at Claremont by the plaintiff for a few weeks, and treated some, but with no apparent good results. Some time in September following, he was traded away by Sweat in such a way that plaintiff realized about $50 for him. Some time during the summer following, the plaintiff made claim upon the defendant for damage, claiming that the horse had been injured while in his care, and subsequently brought this action against him. The plaintiff now relies upon all the counts in its declaration except the 1st and 2d.

In the first place, the defendant claims that he should not be considered as an innkeeper as far as the plaintiff's horses are concerned, because, after he received the horses, he made a special agreement as to the price for board, which was one half the price he charged his regular guests, and because it was his custom to consider horses which were left at his inn for more than a week without the guest, as boarding horses. I find that the horses were received by the defendant as an innkeeper. I understand the law to be, that having received the horses as innkeeper, if his character as such was changed, the burden of proof is upon him to show such change. So considering the law, I am unable to find that the defendant has established the fact of the agreement claimed by a fair preponderance of evidence. I find that it was the defendant's custom to consider horses which were left at his inn for more than a week without the guest, as boarding horses. It does not appear that the horse was suffering from the lameness or the sores when it was delivered into the defendant's charge, but the next morning its legs were what is called stocked—that is, swelled and stiff. I do not find how the horse received the injury that caused the lameness. Both parties rely in great measure upon the testimony of horse medical men in reference to the causes which produced the diseased condition of the horse. The defendant claims that both the lameness and the sores were caused by the epizooty, which the horse had in November, and that its blood was impure and diseased when placed in his charge. He procured as witnesses on this point Dr. Wilkinson and Dr. Peters. Dr. Wilkinson treated the horse after he was taken to Claremont. Dr. Peters never saw the horse, but gave his opinion upon a hypothetical case. Both these witnesses are of opinion, substantially, that the diseased condition of the horse, including both the lameness and the sores, was the result of the epizooty, or some kindred disease.

The plaintiff claims that the lameness was caused by some strain or injury across the back ; that the sores were what are called pipe sores, which are produced by some bruise, or wound,

and that they were produced in this case by the same injury which produced the lameness. They produced as witnesses on this point Drs. Williams and Lovell. Dr. Williams saw the horse at Bradford and prescribed for him. He is now, and was when first called to the horse, of the opinion that the lameness was caused by some sprain, strain, or bruise, and says it could have been produced in several ways; namely : by being cast, or slipping in a stall ; by getting into the snow or mired ; by being set back quickly upon his haunches ; and that a blacksmith might have done it in shoeing. There were no sores ·on the horse when he saw it. He does not seem to be able to account for the kind of sores which the plaintiff claims were on the horse's legs, (namely, pipe sores), as being caused by a sprain, or strain across the back. Dr. Lovell saw the horse in September, after the plaintiff. had disposed of it. He is of opinion that the lameness was caused by some sprain or strain, and that the sores were also caused by the same injury that caused the lameness.

With such a disagreement among doctors, and not having any special knowledge myself in this branch of science, I am constrained to adopt the views of those who have had the best opportunities for knowing, and to adopt those views which appear to me to be most in accordance with the reason of the thing. I think the opinion of Dr. Williams with reference to the lameness, is the better, inasmuch as he had a better opportunity of ascertaining, and is the opinion formed by him when he first saw the horse at Bradford. I also ·think it the' more reasonable view, more especially in view of the fact that there were occasions when the horse might have received an injury, which is described as being likely to cause such lameness. I therefore find that the lameness and weakness across the back was not caused by the epizooty, but was caused by some sprain, or strain, or injury. It does not appear that there was anything about the horse which would have caused this lameness previous to the time he was placed in defendant's charge, unless it was caused by the effects of ·· the epizooty, and it does not appear to me that the effects of the epizooty caused it. I find that the horse was well taken care of at defendant's stable, in feed and exercise, and in the same manner that he took care of his own horses. In arriving at this conclusion, I have considered the first point submitted by the plaintiff as the law, so far as applicable.

With reference to the sores. In view of the fact that pipe sores are caused by some wound of the nature of a bruise, and that the sores on this horse appeared where pipe sores rarely ever occur, and in view of the fact that Dr. Williams, who appears to me to

have a better understanding of this art than the other medical witnesses who testify upon this point, cannot account for pipe sores where these sores were, as being caused by the same injury that caused the lameness across the back, I find that these sores were not pipe sores, and were not one of the immediate results of the injury which caused the lameness.

Inasmuch as these sores did not manifest themselves as an immediate injury to the horse while in the defendant's possession, or as an immediate result of the injury to the horse's back, and did not appear until some time after the horse had gone out of the defendant's possession, I deem it incumbent on the plaintiff, if these sores were in fact one of the after results of this injury, to show such to be the fact. I find it has not done so. Dr. Williams says, when inquiry is made of him as to what may be the effect of such sprain or strain across the hips or kidneys upon the limbs and ankles of the animal, "If the kidneys should become badly diseased, they would become clogged, and would not perform their office, and the fluids would be taken up and carried into the blood, which would become poisoned. It might make its appearance in filled legs or swollen ankles. * * * * It also makes its appearance in the form of ulcers." He does not give his opinion as to whether the injury which he treated in this horse would cause filled legs and ulcers under the circumstances of this case. I do not consider that this can overbalance the testimony produced by the defendant, the principal items of which are, that the horse had recently had the epizooty; that this disease almost invariably leaves the blood more or less out of order; that it had been in use for quite a length of time, at a bad season of the year; that there had been some occasion to doctor it; the appearance of the horse's sores and legs at Chelsea and Claremont; and that these sores are, after a while, one of the sequels to a bad and impure state of the blood. If these sores had been the result of this injury across the back, and caused in the manner suggested by Dr. Williams, I judge from the testimony that they would not have appeared as soon as the sores in this case did. I therefore find that there must have been some other predisposing agent than this injury to the back, to have caused these sores; and that it must have been about the horse before he came to defendant's care. I think the horse's blood must then have been out of order and in an impure condition; and so find. This finding is on the assumption that the injury to the horse's back was received during the time it was in the defendant's care. I find that the horse could probably have been cured of these sores, and of the impurity of the blood. I find that the injury to its

back spoiled it for the plaintiff's use.   I consider that the horse's condition when placed in defendant's charge, and his condition so far as the sores are concerned, affect the value to be placed upon the horse at that time.   I find that defendant kept a livery stable in connection with his hotel, and was accustomed to board horses without any guest stopping with them.   I find that defendant's hostler who had charge of and fed and attended this horse, was well qualified for the place, being accustomed to the business, and careful and attentive.

With reference to damages.   The plaintiff paid out at Chelsea for keeping this horse and its mate, and for transporting this horse to Claremont, N. H., and for feed at Claremont, the sum of $94.26, which I allow, with interest for payment to the 23d of May, 1876. The plaintiff claims to recover for the loss of the services of both horses while at Chelsea.   With reference to this bill I find that it was a bill rendered by Mr. Orcutt, who went to Chelsea to get the horses and to take them to Claremont.   The sum of $94.26 was paid by Sweat to Orcutt.   Sweat had no personal knowledge as to whether the items charged in the bill were actually expended by Orcutt, but paid it supposing they were all right.   Sweat was all the witness called by the plaintiff to prove the facts in reference to the bill.   According to the bill it seems that the sum of $69.26 was expended for keeping the pair at Chelsea and in transporting to Claremont.   The sum of $23.00 for hay and feed after they reached Claremont and $2.00 for medicine   Of the $69.26, the sum of $48.50 was for keeping the pair at Chelsea, and the balance, $20.74, for expense and keeping the pair from Chelsea to Claremont.   The $2.00 expended for medicine I suppose was for the sick horse.   Leaving the sum of $92.26 as the amount expended on account of the pair.   I find that the well horse was left at Chelsea because Sweat had no single hitch-up with which to use him alone, and that no claim is made by the plaintiff for cost of keeping the well horse after arriving at Claremont.

If plaintiff is entitled to recover anything for the loss of the services of the horses while at Chelsea, I find that $15.00, with interest, for each horse, is a fair allowance.   The plaintiff claims to recover an amount paid out at Claremont.   Sweat says in reference to this, "that the bill is for six weeks.   The man spent six weeks the biggest part of his time," and that "plaintiff paid him $50 per month."   It does not appear what part of his time was expended for the care of the horses, or what was paid out on account of it.   It would not be right to allow the whole.   1 therefore allow nothing upon this item.   The plaintiff claims to recover the amount paid Dr. Williams at Bradford.   This I allow at $4,

with interest.   I allow the value of the horse, less the amount received for him by the plaintiff.

The court, at the May Term, 1876, BARRETT, J., presiding, rendered judgment on the report, *pro forma*, for the plaintiff for $294 damages and costs.   Exceptions by defendant.

*Charles P. Marsh* ( *W. C. French* with him), for defendant, cited Edw. Bailm. 404 ; *Dawson* v. *Chamney*, 5 A. & E. 164 ; *Merritt* v. *Claghorn*, 23 Vt 177 ; Story Bailm s. 472 ; *McDaniels* v. *Robinson*, 26 Vt. 316, 336 ; *Hill* v. *Owen*, 5 Blatch. 323 ; *Calyes Case*, 8 Co. 32a, cited 1 Sm. Lead. Cas. 146 ; *Hawley* v. *Smith*, 25 Wend. 642 ; *Johnson* v. *Richardson*, 17 Ill. 302 ; *Whitney* v. *Sears*, 16 Vt. 587 ; *McCrillis* v. *McCrillis*, 38 Vt. 135 ; *Lund* v. *Dawes*, 41 Vt. 370.

—— ——, for plaintiff, cited 2 Hilliard Torts, 536 : Story Bailm. 413, 475 ; *Mason* v. *Thompson*, 9 Pick. 280 ; Chit. Cont. 476, n. ; *York* v. *Grindstone*, 1 Salk. 388 ; *McDaniel* v. *Robinson*, 26 Vt. 316, 343 ; *Morgan* v. *Ravey*, 6 H. & N. 265 ; *Hulet* v. *Smith*, 42 Barb. 230 ; *Norcross* v. *Norcross*, 53 Me. 163 ; *Shaw* v. *Berry*, 31 Me. 478 ; *Gill* v. *Libby*, 26 N. Y. 70 ; *Libby* v. *Aldrich*, 33 N. H. 543 ; *Washburn* v. *Jones*, 14 Barb. 193 ; Jones Bailm. 133 ; 1 Swift Dig. 562 ; *Richmond* v. *Smith*, 8 B. & C. 9 ; 2 Kent Com. 594.

The opinion of the court was delivered by

REDFIELD, J.   The declaration charges that by the negligence of defendant as innkeeper, the plaintiff's horse, entrusted to defendant's care, became sick and worthless.   Judge STORY comprehensively states the rule of duty and liability of innkeepers : " Innkeepers are not responsible to the same extent as common carriers.   The loss of goods while at an inn, will be presumptive evidence of the negligence of the innkeeper or his domestics. But he may if he can, repel the presumption, and show that there has been no negligence whatever, or that the loss has been occasioned by inevitable casualty or superior force."   This rule and definition was adopted by Chief Justice REDFIELD in *McDaniels*

v. *Robinson*, 26 Vt. 316, 336 ; and we would not attempt to improve this as a definition of the rule of duty.   This rule of law is of universal application as to all species of property put in charge of the landlord by the guest.   But when the matter of fact, whether the landlord is in fault in a particular case, is being inquired into and ascertained, in the application of the rule to different species of property and different conditions of property, counter presumptions are often met which exonerate the landlord from any fault.   Animals subject to disease ; cutlery and machinery, liable to rust ; fresh fruits and fish, liable to decay—possess within themselves the germs and susceptibilities that work out such results.   If a horse becomes suddenly diseased, with the botts or other malady, or if fruits perish in the package as delivered to the landlord, the natural presumption is that this condition occurred in the due course and order of things, and from the inherent qualities of the property ; and the imputed fault or negligence of the landlord is repelled.

In this case, it appears that plaintiff's servant, Sweat, left Concord, N. H., on the 10th of Dec. 1872, with this horse harnessed with another, and, traversing portions of New Hampshire and Vermont, on the 15th of January landed at defendant's inn, in Hartford, in this state.   Sweat bargained with defendant to keep the horses for about half the usual price, and left them with the defendant until the 5th of February, when he drove them away, and soon after discovered that this horse manifested a weakness or lameness in the back.   In November before, the horse had been hard sick with the malady called epizooty.   The referee finds that the horse was sick and weak from the 5th to the 11th of said February, when Sweat left him at Chelsea, disabled, and with sores breaking out upon his legs.   That the disease upon the horse in November before, left him in an unhealthy state, and the sores upon the animal were the sequel and result of such disease ; but that the lameness or weakness in the back, resulted from strain or sprain ; but he is unable to discover the cause."   The referee further finds, that " the horse was well taken care of at the defendant's stable in feed and exercise, and in the same manner as he took care of his own horses, and that defendant's hostler

who had charge of and fed and attended this horse, was well qualified for his place, being accustomed to the business; and careful and attentive.

It is insisted by the counsel for the plaintiff, that the referee has stated that the defendant is without fault as to some *particular* things, but has not negated all fault or negligence.   The language of the report in regard to defendant's care of the horse, is more specific and less comprehensive than it should have been.   It is not stated that the horse had water, or was kept in a proper stall; but we think that by the statement, " that the horse was well taken care of at defendant's stable in feed and exercise, and in the same manner as he cared for his own horses, and that his hostler who had charge of him, was experienced, capable, and attentive," the referee intended to state, and does state, fully, in substance, that the defendant, in the management of the horse, was careful and attentive.

There are cases where referees, for the want of a clear conception of the case, without ideas, multiply words; and thus give occasion for debate, and trouble and vex the court.   These are *casualties*, and fault is not to be imputed.   But this report shows that the referee had a full comprehension of the case, and an easy command of fit, and proper language.   And we think he might, without detriment, have omitted the detail of the reasons why one set of horse-doctors obtained more credit with him than others, and stated the facts found in the issue joined, in language more comprehensive and distinct.   But taking the whole report together, it is manifest that this weakness in the back of the horse was not occasioned by the negligence of the defendant.

II.   As to the matter of damages, the case shows that the horse when sound and in his best estate, was worth $175 ; that when delivered to the defendant, he was sick of a disease of long standing ; that from mere debility, he fell down in the highway when driven upon a walk; that from being overdriven in this weak condition, or from falling in the road, or some unknown cause, the horse became weak or lame in the back ; and to redress *this* injury to the horse, the defendant is mulct in $294 damages.

This is about double the value of the horse when sound and well, and some four times the probable value as he was at the time of the injury. Whether the plaintiff, under any circumstances, could recover more than the actual depreciation of the property by reason of the alleged negligence, the case does not require us to determine. But, we think, the burden of damages imposed by this judgment upon this defendant, is alike without precedent and without warrant of law. It is obvious that the learned judge who, *pro forma*, rendered this judgment, made no examination of the case, and allowed plaintiff to compute judgment at his own risk; and his zeal seems to have outrun his discretion—but he "came first to the sepulcher." The result is that the judgment of the County Court is reversed, and judgment on the report for defendant to recover his cost.